**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **BELINDA TATUM,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:16-CV-3488-N-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

By *Special Order No. 3-251*, this social security appeal was automatically referred for full case management. Before the Court are *Plaintiff's Appeal from the Decision of the Commissioner of Social Security*, filed April 6, 2017 (doc. 13), *Defendant's Response Brief*, filed May 1, 2017 (doc. 14), and *Plaintiff's Reply to Brief of Defendant*, filed May 19, 2017 (doc. 15). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED.**

## I.  BACKGROUND[1]

Belinda Tatum (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act). (doc. 13.)

### A.    Procedural History

On September 9, 2011, Plaintiff filed an application for DIB, alleging disability beginning

---

[1]    The background information is summarized from the record of the administrative proceeding, which is designated as "R."

[2]    At the time of filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

on April 6, 2011. (R. at 280-81.) Her claim was denied initially and upon reconsideration. (R. at 138-40.) Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing on February 21, 2013. (R. at 67-101.) On June 19, 2013, the ALJ issued a decision finding Plaintiff not disabled and denying her claim for benefits. (R. at 141-66.) Plaintiff timely appealed the ALJ's decision to the Appeals Council. (R. at 167.) The Appeals Council granted her request for review on August 7, 2014, vacated the ALJ's decision, and remanded the case for further consideration. (R. at 167-70.)

On remand, the ALJ conducted another hearing on April 27, 2015, and Plaintiff personally appeared and testified. (R. at 102-37.) On June 11, 2015, the ALJ issued a decision again finding Plaintiff not disabled and denying her claim for benefits.  (R. at 8-37.) Plaintiff timely appealed the ALJ's decision to the Appeals Council. (R. at 7.) The Appeals Council denied her request for review on November 2, 2016, making the ALJ's decision the final decision of the Commissioner. (R. at 1-6.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.**     **Factual History**

    **1.**     **Age, Education, and Work Experience**

Plaintiff was born on May 30, 1974, and was 38 years old at the time of the first hearing before the ALJ. (R. at 30, 72.) She graduated from high school and communicated in English fluently. (R. at 30-31, 72.) She had past relevant work as a nurse and an office manager. (R. at 30.)

    **2.**     **Medical Evidence**

On February 14, 2011, Plaintiff met with her primary care physician, Dr. Yvonne Reed, M.D., with complaints of "anxiety attacks" and pain in her back and hands. (R. at 382.) Dr. Reed noted that she had an unspecified decrease in the range of motion in her back and that she was

"unable to cope at work." (R. at 382.) She prescribed Lexapro for anxiety and ordered an MRI of Plaintiff's cervical spine. (R. at 382-84.) The MRI results showed evidence of central spinal stenosis, but no disc herniation or bulge at any level. (R. at 383-84.)

On March 24, 2011, Plaintiff presented to the Emergency Room of the Harris Methodist Southwest Hospital for headaches and numbness in her face and left arm. (R. at 386-95.) Her physical examination showed no abnormal findings, and she was "oriented to person, place, and time" with a normal mood and affect. (R. at 390-91.) She received a CT scan of her head, which showed nothing unusual and a "normal noncontrast head CT scan." (R. at 393-94.) The medical record noted that Plaintiff stated after the scan that "her headache [had] resolved, but she still [felt] some numbness in her face." (R. at 392.) She was discharged without any medication and was referred to a neurologist. (R. at 391-92.)

On April 22, 2011, Plaintiff met with Dr. Roger S. Blair, M.D., of the Neurology Associates of Fort Worth, for a neurological assessment of her bilateral upper extremity pain. (R. at 404-09.) Plaintiff complained of headaches, fatigue, eye pain, dizziness, stiffness, and pain in her back and neck. (R. at 405.)  Dr. Blair noted that she was "alert, well oriented to time, place, and person" with an intact intellect and memory. (R. at 406.) There was no "drift, atrophy, fasciculations, or weakness in any of the muscles of the upper or lower extremities," but Plaintiff showed a decreased range of motion in her shoulders and reported "pinprick" pain in her hands and fingers. (R. at 407.) Dr. Blair's diagnostic impressions were "neck pain and headaches secondary to tight neck and upper shoulder muscles," a "mild right frozen shoulder," and "intermittent low back pain secondary to tight lumbar muscles." (R. at 408.) He also ordered a diagnostic test to determine if Plaintiff had carpal tunnel syndrome. (R. at 408.) He opined that the cause of her pain was "myofascial" and due

to "shortened muscles that produce[d] intermittent or constant pain," and he recommended that she regularly perform a series of four different stretching exercises to relieve the pain. (R. at 408-09.) Dr. Blair noted that Plaintiff "performed a full set of these exercises [during the assessment] with a significant reduction in pain and significant improvement in [range of motion]." (R. at 409.) He also ordered epidural steroid injections that Plaintiff received on April 27, 2011, and May 11, 2011. (R. at 396-97, 409.)

On May 26, 2011, Plaintiff returned to Dr. Blair for a follow-up examination and a carpal tunnel diagnostic evaluation. (R. at 398-403.) Her arm/hand pain had "improved since she had the [steroid] injections," and the "pain and numbness in the hand [had] decreased" after performing the stretching exercises. (R. at 398.) She still complained of fatigue, stiff joints, headaches, numbness, dizziness, muscle weakness, and pain in her bilateral upper extremities, however. (R. at 399.) During her physical examination, Plaintiff showed an increased range of motion in her shoulders, a regular gait while walking, and no weakness in "any of the muscles of the upper or lower extremities." (R. at 400.) Her diagnostic showed "no electrophysiological evidence of carpal tunnel syndrome," and Dr. Blair instructed her to continue the neck and shoulder exercises. (R. at 403.)

From July 5, 2011, to February 27, 2015, Plaintiff had regular appointments and continual treatment with Dr. Sonia Bajaj, M.D., of the Huguley Medical Associates–Rheumatology Clinic upon referral from her primary care physician. (R. at 469-83, 512-13, 515-33, 551-92, 602-07.) During the initial evaluation, Dr. Bajaj noted Plaintiff's complaints of fatigue and "generalized joint and muscle pain" in her hip, neck, back, knees, ankles, and feet. (R. at 475.) Dr. Bajaj found during the physical examination that she had a "few Heberden's nodes" but otherwise a "normal range of motion with no pain or swelling over shoulders, elbows, wrists, hips, knees, [and] ankles" and

4

"normal muscle strength and tone." (R. at 475.) She diagnosed Plaintiff with systematic lupus erythematosus, inflammatory arthritis, depression, polyarthralgias, and myalgias. (R. at 475, 525-26.) She prescribed Neurontin for pain and also recommended taking over-the-counter Ibuprofen as needed. (R. at 476.) During her subsequent appointments, Dr. Bajaj regularly noted that Plaintiff was "in no distress, sitting," with a "normal muscle strength and tone in all four extremities," a "normal gait," and a "normal range of motion and curvature to cervical, thoracic, and lumbar spine." (R. at 519, 521, 525, 527, 555, 562, 574-75, 581, 588, 602, 604.) She also noted during each psychological assessment that Plaintiff was "alert, awake, and oriented" and had "no gross motor or sensory deficits" with normal coordination and reflexes. (R. at 519, 521, 525, 527, 556, 563, 582, 588, 604.)

On October 2, 2011, Loretta Pryor Bruce, M.S., L.P.C., submitted a letter detailing her professional counseling relationship with Plaintiff. (R. at 444.) She had been counseling Plaintiff "intermittently since February 23, 2011," but she had to discontinue therapy "because of financial reasons" at the end of July 2011. (R. at 444.) Ms. Bruce had "used cognitive behavioral therapy to help [Plaintiff]" with her depression and anxiety. (R. at 444.) She opined that Plaintiff had "experience[d] continuous pain which increase[d] [her] depression and inability to concentrate," which was "the reason psychologically and physically she [could not] work." (R. at 444.)

On November 11, 2011, Plaintiff met with Dr. Betty Eitel, Ph.D., for a consultative psychological examination and evaluation. (R. at 445-50.) She described "feeling blah" with daily pain and a lack of motivation. (R. at 446.) She also reported memory problems, symptoms of a panic attack, being "highly distractible," and a constant feeling of anxiety. (R. at 447.) She could drive "when she [had] to," could manage money, used a phone calendar to keep track of appointments,

5

and could cook on the stove and in a microwave. (R. at 447.) Dr. Eitel noted that Plaintiff had a depressed mood, displayed appropriate and logical thoughts, had no delusions or unusual thoughts; had a "slightly impaired" concentration and ability to retain information; and had abstract reasoning levels "below the normal range." (R. at 449.) Her diagnostic impressions were that Plaintiff had major depressive disorder, dementia NOS, panic disorder, and generalized anxiety disorder, and she assigned a Global Assessment of Functioning (GAF) score of 49. (R. at 450.) Dr. Eitel offered a guarded prognosis and found her capable of managing her benefits without assistance. (R. at 450.)

On November 23, 2011, Dr. James B. Murphy, Ph.D., a state agency medical consultant (SAMC), completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity (RFC) Assessment form based upon Plaintiff's medical evidence in the record. (R. at 451-68.) He first noted that Plaintiff had been diagnosed with the following psychological disorders: dementia, NOS; major depressive disorder, recurrent; a panic disorder without agoraphobia; and a generalized anxiety disorder. (R. at 452-60.) He opined that these disorders caused moderate difficulties in maintaining concentration, persistence, or pace, as well as mild restrictions for activities of daily living and maintaining social functioning. (R. at 461.) He further opined that Plaintiff's alleged limitations were "not wholly credible;" even though she had "some residual [symptoms] of depression and anxiety, these [were] not sufficiently severe to wholly compromise her ability to work," and her assigned GAF score of 49 was an "overestimation of [symptom] severity." (R. at 463.) In Plaintiff's RFC assessment, Dr. Murphy opined that she could "understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in routine work settings." (R. at 467.)

On December 13, 2011, Dr. Laurence Lignon, M.D., a SAMC, reviewed Plaintiff's medical evidence on record and submitted a Physical RFC Assessment form. (R. at 484-91.) He determined that her primary diagnoses were inflammatory arthritis and myalgias. (R. at 484.) He opined that Plaintiff had the following exertional limitations: could occasionally lift/carry 20 pounds; could frequently lift/carry 10 pounds; could stand/walk with normal breaks for about 6 hours in an 8-hour workday; could sit for about 6 hours in an 8-hour workday; and had an unlimited ability to push/pull. (R. at 485.) He further opined that she had no postural, manipulative, visual, communicative, or environmental limitations. (R. at 486-88.) He concluded that Plaintiff's alleged limitation due to pain were "not wholly credible" when compared to the medical evidence in the record. (R. at 489.)

On February 21, 2012, Plaintiff met with Dr. Brad Harman, M.D., of Cleburne Orthopedics and Sports Medicine (Cleburne Orthopedics) for pain in her left hip. (R. at 539-41.) She described the pain as "stiffness" and complained about how her left hip had been "popping" and "snapping." (R. at 540.) Dr. Harman found upon examination that Plaintiff had "good active forward flexion and abduction," could "tolerate internal and external rotation without any reproduction of groin pain," and denied any radicular symptoms in her lower leg. (R. at 540.) His diagnostic impression was "left snapping hip," and he referred Plaintiff to "outpatient physical therapy to retrain her gait pattern" and scheduled her for a follow-up evaluation.[3] (R. at 540.)

On March 15, 2012, Dr. Randal Reid, M.D., a SAMC, completed a Case Assessment Form for Plaintiff's physical impairments upon reconsideration, based upon Plaintiff's updated medical records from Dr. Bajaj being added to her file. (R. at 504.) Dr. Reid affirmed Dr. Lignon's Physical RFC assessment from December 13, 2011, and noted that the updated medical records did "not

---

[3] The administrative record does not include any medical records for physical therapy or Plaintiff's follow-up evaluation with Dr. Harman.

detail a significant deterioration." (R. at 504.)

On March 22, 2012, Dr. Cate Miller, M.D., a SAMC, completed a Case Assessment Form for Plaintiff's mental impairments upon reconsideration, based upon the medical records. (R. at 506-09.) She affirmed Dr. Murphy's assessment from November 23, 2011, and noted that the limitations were "primarily physical." (R. at 506.) Dr. Miller, however, did point out that Plaintiff's diagnosis of dementia did not appear in any of the medical records other than the report from the consultative examiner, Dr. Eitel. (R. at 506.)

On November 29, 2012, Dr. Bajaj submitted a Medical Opinion Re: Ability to Do Work-Related Activities (Physical) Form on behalf of Plaintiff. (R. at 512-13.) She opined that Plaintiff had the following exertional limitations: could occasionally lift/carry less than 10 pounds; could frequently lift/carry less than 10 pounds; could stand/walk with normal breaks for less than 2 hours during an 8-hour workday; could sit with normal breaks for about 2 hours during an 8-hour workday; and needed to lie down and elevate her legs at unpredictable intervals during a normal work day. (R. at 512.) She further opined that Plaintiff could never twist, stoop, bend, crouch, climb, kneel, crawl, or balance because of her "swollen and tender joints." (R. at 513.)

On February 5, 2013, Dr. Bajaj submitted a second Medical Opinion of Plaintiff's physical limitations. (R. at 515-18.)  She opined that Plaintiff had the following limitations: could sit/stand between 1-2 hours with a frequent need to change positions in an 8-hour workday; could occasionally lift/carry up to 10 pounds; limited ability in pushing/pulling/grasping/manipulating in both hands; could occasionally bend, squat, reach, and stoop; and could never crawl, climb, kneel. (R. at 515-17.) She further opined that Plaintiff would be an unreliable worker and suffered from chronic pain that was "moderate." (R. at 517.) She explained that these limitations were due to pain

8

and arthritis. (R. at 515-18.)

From August 26, 2013, to February 4, 2015, Plaintiff met with psychiatrist Dr. Hanane Chichane, M.D., approximately every two months for treatment of her depressive disorder and refills of her medications. (R. at 542-50, 593-98.) During her initial diagnostic interview, Plaintiff reported a history of depression and "feeling miserable." (R. at 547.) Dr. Chichane noted that she showed a healthy but anxious appearance, "tense" behavior, an anxious and depressed mood, an appropriate affect, no abnormal thought content or process, and good cognitive abilities with average intelligence. (R. at 549.) Dr. Chichane diagnosed her with major depressive disorder, depression, panic disorder, and assigned a GAF score of 60. (R. at 550.) Plaintiff reported minor improvements in her mood during the treatment, and Dr. Chichane regularly noted how she had "fair" insight/judgment. (R. at 543, 544, 546, 593-98.)

On February 8, 2013, April 14, 2014, June 10, 2014, September 11, 2014, December 22, 2014, and March 11, 2015, Plaintiff presented to the Hoffman Family Practice Associates for a variety of general ailments, including earaches, sinusitis, fatigue, influenza, shoulder pain, joint pain, and allergic rhinitis. (R. at 608-37.) Her physical exams regularly showed no cardiovascular or musculoskeletal abnormalities, and her neurological exams noted that she had a "normal" mental status with "no neuro deficit." (R. at 611, 615, 616-17, 619-20, 622, 625.) During her appointment on December 22, 2014, she reported a "dull aching" pain in her left shoulder, and an X-ray showed a "decreased joint space in upper glenohumeral joint" but "5/5" muscle strength was noted in both of her upper extremities. (R. at 615.)

### 3.   February 21, 2013 Hearing

Plaintiff, her husband (Husband), and a vocational expert (VE) testified at a hearing before

the ALJ on February 21, 2013. (R. at 67-101.) Plaintiff was represented by an attorney. (R. at 69.)

        *a.*    ***Plaintiff's Testimony***

Plaintiff testified that she had graduated from high school and had also completed a one-year nursing program and received a licensed vocational nurse (LVN) degree in 2002. (R. at 72.) Her most recent job had been as a full-time school nurse for the Joshua Independent School District, but she resigned after four years in April 2011, because she "got really sick" with severe anxiety and depression. (R. at 73, 75.) Before that, she had worked as a nurse for a home health care agency beginning in 2003. (R. at 75.) She had also worked for a year in a construction office where she "took care of all their bookkeeping, cleaning the office, taking care of everything there." (R. at 76.) She had been applying for part-time receptionist jobs, but she had been unable to secure a position. (R. at 74.)

Plaintiff explained that she had headaches "about twice a month" that lasted "at least five to six hours" and were "so bad" that she could only "just lie there." (R. at 78.) She also had pain in her ankles, knees, hips, hands, wrists, shoulders, and neck, but the worst pain was in her hips and ankles. (R. at 79.) Her knuckles would frequently swell after continued use, such as writing or typing continuously for "15, 20 minutes," and she had problems lifting items when her hands were swollen. (R. at 80-81.) She testified that she could lift "probably about 10 pounds," could walk for "about 10, 15 minutes" without pain, could sit for "probably 15, 20 minutes" before having pain, and could stand for "20, 30 minutes" if she "kept [her] weight off [her] left leg." (R. at 81-82.) She had to lie down every day "at least probably a couple hours" throughout the day due to fatigue and pain. (R. at 82-83.) Two to three times a month she "just [could not] do anything" except to "lie in bed." (R. at 83.) She also had episodes of depression "once or twice a month," and she experienced "flares,"

which she described as feelings where "your body hurt from head to toe . . . [with] muscle pain and stuff like that." (R. at 85.) These "flares" lasted "anywhere from two days to a week," but the effects were lessened after she was prescribed pain medication and anti-depressants by her primary care physician and her rheumatologist, but she had never been referred to a psychiatrist. (R. at at 85-86, 88-90.) In 2006, she had surgery on her neck to help with her headaches, but she still experienced "numbness in [her] fingers and stuff, which the doctor said that was just permanent damage."[4] (R. at 90-91.) Other than one trip to the emergency room in March 2011, she had not received any additional surgeries or hospitalizations since 2006. (R. at 91-92.)

### b.    Husband's Testimony

Husband testified that he had been married to Plaintiff for "almost 10 years" and had resided with her since then. (R. at 93.) He and their two teenage daughters took care of Plaintiff when she had a "flare-up," and they completed the primary household activities, including cooking, cleaning, and shopping. (R. at 84.) Since 2011, Plaintiff was now "totally 180," and he had to help her with household chores that she had never needed help with before. (R. at 93-94.) He further testified that Plaintiff did not "want to do anything because . . . she's hurting all the time." (R. at 94.)

### c.    VE's Testimony

The VE testified that she had reviewed Plaintiff's vocational records and determined that she had the past relevant work of nurse and office manager. (R. at 94-95, 351-52.)

The ALJ asked the VE to consider a hypothetical person of the same age and education as Plaintiff who could perform the full range of "light work" with the following limitations: able to lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; can sit, stand, or walk,

---

[4] The administrative record did not contain the medical records of the 2006 neck surgery.

11

individually or in combination, throughout an eight-hour work day; and limited to occupations with a reasoning development level of one or two as defined in the Dictionary of Occupational Titles (DOT). (R. at 95.) The VE testified that this hypothetical person could not perform any of Plaintiff's past relevant work. (R. at 95.)

The ALJ then asked if this hypothetical individual could perform any jobs that existed in the national economy. (R. at 95-96.) The VE responded that this hypothetical individual could perform jobs in the "light, unskilled" job base including: bench assembler (DOT 739.637-030) with 196,000 jobs nationally and 11,000 in Texas; bench inspector (DOT 712.684-050) with 416,000 jobs nationally and 30,000 in Texas; and sorter (DOT 222.687-014) with 247,000 jobs nationally and 18,000 in Texas. (R. at 96-98.) The VE further stated that her testimony was consistent with the descriptions in the DOT. (R. at 97.)

Plaintiff's attorney asked the VE to add the following limitations: able to sit for only "15, 20 minutes" at one time; able to stand for only "20 to 30 minutes" at one time; and could "only use both hands for repetitive activity for 15 to 20 minutes, then would have to rest them 5 to 10 minutes." (R. at 98-99.) The VE responded that this hypothetical individual would not be able to perform any of the previously mentioned jobs. (R. at 99.) Plaintiff's attorney then added another limitation that the hypothetical individual had to "lie down . . . a total of three hours a day." (R. at 99-100.) The VE testified that this hypothetical individual would not be able to perform any jobs in the national economy. (R. at 100.)

### 4.    April 27, 2015 Hearing

On remand, Plaintiff and Husband testified at a hearing before the ALJ on April 27, 2015. (R. at 102-37.) Plaintiff was represented by an attorney. (R. at 104.) The VE also attended this

hearing was not asked any questions by the ALJ or Plaintiff's attorney. (*See* R. at 102-37.)

        *a.*     ***Plaintiff's Testimony***

Plaintiff testified that since the initial hearing, she had attempted to work part-time as an assistant to an accountant. (R. at 109-10.) She worked "about 15 hours a week" for "about six months" before she had been fired for being "unreliable" and "not fast enough for him." (R. at 110.) She had regularly been absent two or three times a week because of her pain "flare-ups" and joint pain. (R. at 110-11.) She described it as "basically pain that feels like the flu." (R. at 111-12.)

Plaintiff experienced flare-ups "one or two" times a month in the winter and "start[ed] feeling better" in the summer months. (R. at 112.)  Her flare-ups lasted "two to three days" on average, but she had experienced one that lasted for two weeks. (R. at 112.) During a flare-up, she had to lie down, take her prescription medication, and "sometimes" received a steroid shot from her physician. (R. at 113.) She also had daily swelling and pain in her hip joints and shoulders, but the swelling was reduced when she laid on the couch and took her anti-swelling medication. (R. at 114-15.) Her rheumatologist instructed her to lie down and prop her feet up whenever she was in pain from her joint swelling and lupus. (R. at 115-16.) She had also recently started feeling pain in her chest "three or four times a week" that she believed was caused by "the lupus and pleurisy." (R. at 116-17.) Her rheumatologist had diagnosed her with fibromyalgia because "of all the tender point[s] in [Plaintiff's] back." (R. at 118-19.) She also had been recently diagnosed with Raynaud's phenomenon, which caused her "fingers [to] turn blue" whenever she was exposed to an abrupt change in temperature. (R. at 121-22.) Aside from a "tingling" sensation, she had not noticed the Raynaud's phenomenon to "affect [her] ability to use the fingers." (R. at 123.)

Plaintiff had been regularly meeting with a psychiatrist to treat her depression since August

2013. (R. at 123-24.) Her depression caused her to feel "hopeless" and "guilty" because she was "not giving as much as [she] used to [her] family." (R. at 125.) She also had crying episodes and could sleep for only "three to five hours" per night. (R. at 125-27.)

When asked about her daily activities, Plaintiff testified that she rarely left her house because she did not "feel up to it" and had "anxiety about leaving sometimes." (R. at 128-29.) She could do "light housework" for "about 5, 10 minutes . . . sometimes 15" before she had to rest again. (R. at 129-30.) She did not cook, shop for groceries, or exercise, and she was not involved in any social groups. (R. at 130-31.) She could drive for "a little bit," such as when she drove her children to the school that was "seven or eight minutes away" from her house. (R. at 131.)

### b.    Husband's Testimony

Husband testified that he and Plaintiff had been married for "going on 12" years. (R. at 133.) He worked full-time from "6:00 a.m. to 4:00 p.m., Monday through Friday," but was "generally" home in the evenings and on weekends. (R. at 133-34.) He completed most of the housework, while Plaintiff helped with "[w]hatever her body lets her do." (R. at 134.)  She would "lie down with her feet up" twice a day for "[t]wo or three hours" at a time. (R. at 134-35.) Over the past two years, he had personally observed swelling in the joints of her hands, legs, and ankles that had prevented her from completing routine tasks, such as blow-drying her hair. (R. at 135.) He had difficulty conversing with Plaintiff because she "just can't remember what she says sometimes . . . [where she will] start saying something and then all of a sudden she forgets what she says." (R. at 136.)

### C.    ALJ's Findings

The ALJ issued a decision denying benefits on June 11, 2015. (R. at 8-37.) At step one,[5] he

---

[5] The five-step analysis used to determine whether a claimant is disabled under the Social Security Act is described more specifically below.

determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of April 6, 2011. (R. at 14.) At step two, the ALJ found that the medical evidence established that Plaintiff had a severe combination of the following impairments: systematic lupus erythematosus; inflammatory arthritis; fibromyalgia; dementia, not otherwise specified; major depressive disorder; panic disorder, without agoraphobia; and generalized anxiety disorder. (R. at 14.) At step three, the ALJ concluded that Plaintiff's severe impairments or combination of impairments did not meet or equal the requirements for presumptive disability under the listed impairments in 20 C.F.R. Part 404. (R. at 14-17.)

The ALJ then determined that Plaintiff retained the residual functional capacity (RFC) to: lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently; sit, stand, or walk (individually or in combination) throughout an eight-hour workday; and otherwise perform the full range of light work, except she was limited to occupations with a "reasoning development level of 1 or 2 (as defined in the Dictionary of Occupational Titles)." (R. at 17-29.)

At step four, the ALJ found that Plaintiff was unable to perform any of her past relevant work. (R. at 30.) At step five, the ALJ relied upon the VE's testimony to find her capable of performing work that existed in significant numbers in the national economy, including jobs such as bench assembler, bench inspector, and sorter. (R. at 31.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from the alleged onset of disability date of April 6, 2011, through the date of his decision. (R. at 31.)

## II. LEGAL STANDARD

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*,

16

954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4.  If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir.

1987).

# III. ISSUES FOR REVIEW

Plaintiff presents three issues for review:

1.     The Appeals Council remanded this matter to the ALJ, finding that the ALJ's decision did not contain a function-by-function assessment of Plaintiff's ability to perform work-related mental activities; and sufficient rationale, with specific references to the evidence of record, in support of the assessed limitations. The ALJ found that Plaintiff [had] moderate limitations in the area of concentration, persistence or pace, but the Council found that the residual functional capacity did not adequately incorporate those assessed limitations. The ALJ was directed to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the occupational base. In his subsequent decision, the ALJ again found that [Plaintiff had] moderate difficulties with regard to concentration, persistence, or pace but can attend and concentrate for extended periods and respond appropriately to changes in routine work settings. The ALJ did not question the vocational witness as to the effect of moderate limitations in concentration, persistence, or pace upon the occupational base. Did the ALJ properly evaluate and consider Plaintiff's mental impairments in determining her residual functional capacity?

2.     The ALJ noted that two medical source statements were provided by Plaintiff's treating rheumatologist. A letter was also provided by her treating therapist. The ALJ gave the opinions of the treating rheumatologist "limited weight." But the ALJ noted the positive findings, which the treating physician relied upon as a basis for her opinions. Further, the ALJ failed to apply the factors set forth in the Commissioner's regulations to evaluate medical opinion evidence. Did the ALJ properly consider medical opinion evidence in determining Plaintiff's residual functional capacity?

3.     [Plaintiff] testified that she [had] significant exertional and non-exertional limitations which adversely affect her ability to perform work-related activities. She maintained that she cannot sustain sitting, standing, or walking for more than a few minutes; has limited ability to use her hands and fingers for grasping and manipulation; and has swelling which causes her to lie down and elevate her legs. Her treating physician reported that Plaintiff [had] all of these symptoms and is limited, consistent with [Plaintiff's] testimony. Yet, the ALJ failed to credit or consider these additional limitations. Did the ALJ properly consider all of Plaintiff's work-related limitations in determining her residual functional capacity?

18

(doc. 13 at 2-3.)

## A.    <u>Mental Limitations</u>

Plaintiff argues that the ALJ failed to follow the Appeal Council's directions on remand to consider her "ability to perform work-related mental activities" during the RFC evaluation, and also failed to "pose the specific [mental] limitations to the vocational expert witness." (doc. 13 at 9-10.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1. The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994).

A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*,

67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence". *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, the Appeals Council remanded the initial decision because it did "not contain a function-by-function assessment of [Plaintiff's] ability to do work-related mental activities and sufficient rationale with specific references to evidence of record," explaining that "[a]lthough the decision assesses moderate limitations [at Step 2] in the area of concentration, persistence, or pace, the [RFC did] not adequately incorporate those assessed limitations." (R. at 168-69.) The Council instructed the ALJ to give "further consideration to [Plaintiff's] maximum [RFC] during the entire period at issue and provide rationale with specific references to evidence of record;" he was also instructed to obtain "evidence from a vocational expert to clarify the effect of the assessed limitations on [Plaintiff's] occupational base," and the "hypothetical questions should reflect the specific capacity/limitations established by the record as a whole." (R. at 169.)

1.    *Function-by-Function Assessment*

Plaintiff first contends that the ALJ failed to conduct the necessary function-by-function assessment of her mental impairments. (doc. 13 at 9-11.)

During the RFC evaluation, an ALJ must conduct a function-by-function assessment based

on exertional and nonexertional capacity. *See Titles II & XVI*: *Assessing Residual Functional Capacity in Initial Claims*, SSR 96–8P. As with exertional capacity, nonexertional capacity is expressed in work-related functions. *Id.* Work-related mental functions and activities include the abilities of: (1) understanding, remembering, and carrying out instructions; (2) using judgment in work decisions; (3) responding appropriately to supervision and peers, and (4) dealing with changes in a routine setting. *Id.* The function-by-function assessment, however, does not require an exhaustive discussion of each work-related mental activity as long as it is considered in the ALJ's analysis. *See Haynes v. Colvin*, No. 6:12-CV-00330-WSS, 2015 WL 3964783, at *5 (W.D. Tex. June 29, 2015) (citing *Walton v. Astrue*, No. 3:10-CV-815-D, 2011 WL 195975, at 9-10 (N.D. Tex. Jan. 20, 2011)). "[E]ven if the ALJ fails to conduct a function-by-function analysis, he satisfies this requirement if he bases his RFC assessment, at least in part, on a state medical examiner's report containing a function-by-function analysis." *Jones v. Astrue*, No. 3:11-CV-3416-M-BH, 2013 WL 1293900, at * 16 (N.D. Tex. Mar. 7, 2013) (citing *Beck v. Barnhart*, 205 F. App'x 207, 213-14 (5th Cir. 2006)).

Here, the ALJ found at Step 2 in both his first and second decisions that Plaintiff had "moderate difficulties" in regard to "concentration, pace, or persistence," which was consistent with the opinions of Dr. Eitel and the SAMCs. (R. at 15, 148.) Unlike his first decision, the ALJ's decision after remand specifically included a section in which he "considered and analyzed [Plaintiff's] ability to perform work-related mental activities." (R. at 28.) He identified the medical records and opinions from Dr. Reed, Ms. Bruce, Dr. Eitel, and the SAMCs. (R. at 28.) Based upon those records, he found that Plaintiff "could respond appropriately to supervision and coworkers," could "understand, remember, and carry out simple instructions and make simple decision," could

"attend and concentrate for extended periods of time," and could "respond appropriately to changes in routine work settings." (R. at 28.) Based upon these findings, the ALJ explained that "the ability to understand, remember, and carry out simple instructions and the ability to make simple decisions are equal to and consistent with simple work, specifically to occupations with a reasoning development level of 1 or 2" as defined by the DOT. (R. at 28-29.)

Plaintiff contends that this finding is flawed because the ALJ "never considered the ability to use judgment in work-related decisions," and his "determination that [she] can attend and concentrate for extended periods is inconsistent with his own findings [at Step 2] and with the findings of the [SAMC]." (doc. 13 at 9-10.) The ALJ, however, does make a specific finding in his decision that Plaintiff was capable of "mak[ing] simple decisions" in a workplace setting and also noted that his assessment is consistent with the SAMC's assessment that Plaintiff could "understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in routine work settings." (R. at 28, 467.) Even though both the SAMC in his Psychiatric Review Technique form and the ALJ in Step 2 of his decision determined that Plaintiff had "moderate limitations" in regard to "concentration, persistence, and pace," this does not render the RFC finding that Plaintiff could "attend and concentrate for extended periods" inconsistent. *See* SSR 96-8P ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria [of the Psychiatric Review Technique] are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."); *see Holmes v. Astrue*, No. 3:11-CV-2634-G-BH, 2013 WL 638830, at *13 (N.D. Tex. Jan. 25, 2013), *adopted by* 2013 WL 646510 (N.D. Tex. Feb. 20, 2013) (explaining that

"[a]lthough the ALJ must consider the claimant's 'paragraph B' functional limitations when determining the mental RFC, he is not required to incorporate them into his RFC assessment 'word-for-word'").

The record shows that the ALJ considered and incorporated into his RFC assessment Plaintiff's ability to use judgment in work-related decisions and her moderate limitations in maintaining concentration, persistence, or pace. Nevertheless, he also satisfied this requirement by basing his opinion on the SAMC's mental RFC assessment and Psychiatric Review Technique, which contains a function-by-function analysis.[6] (R. at 28, 451-68); *see Jones*, 2013 WL 1293900, at * 16. Substantial evidence in the record supports the ALJ's finding that Plaintiff's mental limitations restricted her RFC to occupations with a reasoning development level of 1 or 2 as defined by the DOT. *See Kight v. Colvin*, No. 3:12-CV-4920-BF, 2014 WL 1281049, at *3 (N.D. Tex. Mar. 31, 2014) (finding no error when the ALJ's RFC determination limited the plaintiff "to jobs with a reasoning development level of one or two" because it incorporated ALJ's previous findings that the plaintiff had "moderate restrictions in activities of daily living, moderate deficiencies in concentration, persistence, or pace, and mild difficulties in maintaining social functioning"); *see also Smith v. Colvin*, No. 3:13-CV-1884-N-BN, 2014 WL 1407437, at *4 (N.D. Tex. Mar. 24, 2014), *adopted by* 2014 WL 1407440 (N.D. Tex. Apr. 11, 2014) (noting that courts in the Fifth Circuit "have held that an RFC limited to 'simple work' reasonably incorporates a moderate or even marked

---

[6] Plaintiff contends that the ALJ "failed to consider" the SAMC's "Summary Conclusions" in the checked boxes of the first section of the Mental RFC Assessment Form. (doc. 13 at 9.) There is, however, "nothing in the commissioner's regulations or rulings that requires an ALJ to make findings concerning each of the limitations listed [in Section I] on the 'Summary Conclusions' portion of the [Mental RFC Assessment] forms utilized by the SAMCs in assessing a claimant's mental residual functional capacity." *McDaniel v. Colvin*, No. 4:13-CV-989-O, 2015 WL 1169919, at *11 (N.D. Tex. Mar. 13, 2015) (citing *Huber v. Astrue*, No. 4:07-CV-477-A, 2008 WL 4694753, at *7 (N.D. Tex. Oct. 22, 2008)). According to the Commissioner's Programs Operations Manual System ("POMS"), Section I of the Mental RFC Assessment form is "merely a worksheet to aid [the medical consultant] in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." POMS § DI 24510.060B.2.

23

limitation in concentration, persistence, or pace") (collecting cases). Because substantial evidence

supports the ALJ's mental RFC assessment, remand is not required on this issue.[7]

### 2.    *Hypothetical to VE*

Plaintiff also contends that the ALJ erred because he "did not pose the specific [mental]

limitations to the vocational expert witness, as directed by the Appeals Council." (doc. 13 at 10-11.)

Here, the ALJ held a hearing on remand, but he did not elicit any new testimonial evidence

from the VE as to the effect of the assessed mental limitations on Plaintiff's occupational base. (*See*

R. at 102-37.) In his decision, the ALJ explained that he "found that the testimony of the vocational

expert from the first hearing continued to be valid and dispositive concerning the effects of the

assessed limitations on [Plaintiff's] occupational base" because the determined RFC was the same

as the one from the initial decision. (R. at 29-30.) Plaintiff contends that this was error because

"there is no vocational evidence which would establish that the functional limitations, accepted by

the [SAMC] and accepted by the ALJ (*i.e.*, moderate limitations in concentration, persistence, and

pace) would have no effect on [Plaintiff's] ability to perform the jobs relied upon by the ALJ at Step

5." (doc. 13 at 10.)

At the first hearing, the ALJ asked the VE to consider a hypothetical person of the same age

and education as Plaintiff who could perform the full range of "light work" with the following

limitations: able to lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; can

---

[7] Though not identified as a separate issue, Plaintiff points out in this section that the ALJ's decision "never mentioned Dr. Chichane's name . . . never evaluated his findings . . . and never considered the doctor's psychiatric findings, prescriptions, or course of treatment." (doc. 13 at 11.) Though the ALJ's decision did not explicitly weigh this particular medical record, it does state that the ALJ "read and considered all of the medical evidence in the file, even if not specifically mentioned in the decision," and Plaintiff has failed to show how any error to weigh this medical record was harmful. *See Hammond v. Barnhart*, 124 F. App'x 847, 851 (5th Cir. 2005) (affirming denial of benefits when the ALJ failed to weigh a medical record because "[t]he ALJ's failure to mention a particular piece of evidence does not necessarily mean that he failed to consider it, and the ALJ's decision states explicitly that he considered the entire record in his decision"). To the extent that Plaintiff brings this issue, there is no harmful error and remand is not required

sit, stand, or walk, individually or in combination, throughout an eight-hour work day; and limited to occupations with a reasoning development level of one or two as defined in the DOT. (R. at 95.) The VE testified that this hypothetical individual could perform jobs in the "light, unskilled" job base, including bench assembler, bench inspector, and sorter. (R. at 95-97.) As previously discussed, the ALJ's finding that Plaintiff was limited to occupations with a reasoning development level of one or two as defined in the DOT properly included all of Plaintiff's mental impairments and limitations. The ALJ accordingly included all the mental limitations supported by the record into the hypothetical to the VE during the first hearing. *See Boyd,* 239 F.3d at 707 (explaining that the ALJ is only obligated to reasonably incorporate in the hypothetical all of the plaintiff's disabilities that she recognized); *see Herring v. Astrue,* 788 F. Supp. 2d 513, 518 & n.2 (N.D. Tex. 2011) (holding that hypothetical reasonably incorporated limitations found by ALJ because question closely tracked ALJ's RFC assessment, which took into consideration all impairments); *see also Smith*, 2014 WL 1407437, at *5 (finding that the "ALJ was not required to expressly include a limitation for concentration, persistence, or pace in her hypothetical to the VE" when the "ALJ considered the limitations in concentration, persistence, or pace when determining Plaintiff's RFC").

Because the ALJ properly articulated Plaintiff's specific functional limitations in the hypothetical question to the VE, the hypothetical question during the first hearing was valid, and there was substantial evidence to support the ALJ's Step 5 finding. *See Bordelon v. Astrue*, 281 F. App'x 418, 422-23 (5th Cir. 2008) (finding that restrictions in the hypothetical to VE on "rare public interaction, low stress, and simple, one- to two-step instructions reflect that the ALJ reasonably incorporated [the plaintiff's] moderate concentration, persistence, and pace limitations such that the hypothetical question was proper").

B.    **Treating Source Opinion**

Plaintiff next argues that the ALJ erred in determining her RFC by failing to properly evaluate Dr. Bajaj's treating source opinions as required under 20 C.F.R. § 404.1527(c). (doc. 13 at 11-14.)

Although every medical opinion is evaluated regardless of its source, the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* at § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give that opinion controlling weight. *Id.* at § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* at § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an

26

opinion of any physician may be rejected. *Id.* Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, Dr. Bajaj provided medical opinions of Plaintiff's physical limitations on November 29, 2012, and February 5, 2013. (R. at 512-13, 515-18.) She opined that Plaintiff had the following limitations: could occasionally lift/carry less than 10 pounds; could frequently lift/carry less than 10 pounds; could stand/walk with normal breaks for less than 2 hours during an 8-hour workday with a frequent need to change positions; could sit with normal breaks for about 2 hours during an 8-hour workday; a limited ability in pushing/pulling/grasping/manipulating in both hands; and had limitations in her ability to twist, stoop, bend, crouch, climb, kneel, crawl, and balance. (R. at 512-13, 515-17.) The ALJ specifically reviewed Dr. Bajaj's two assessments. (R. at 20-25.) After reviewing the medical records of Drs. Reed, Bajaj, Blair and from Cleburne Orthopedics, he gave "limited weight" to the two assessments because they "were not consistent with [Dr. Bajaj's] own objective findings in her treatments records," which were "generally within normal limits." (R. at 20-29.) The ALJ also explained that the "treatment records did not indicate any reports by [Plaintiff] of any specific limitations" that would support the "severity of the limitations opined by Dr. Bajaj."

27

(R. at 29.) The ALJ ultimately did not accept Dr. Bajaj's treating source opinion and determined that Plaintiff retained the RFC to: lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently; sit, stand, or walk (individually or in combination) throughout an eight-hour workday; and otherwise perform the full range of light work, except she was limited to occupations with a reasoning development level of 1 or 2 as defined in the DOT. (R. at 17-29.)

Plaintiff contends that the ALJ erred because he "never referred to the 404.1527 factors in evaluating the opinion of the treating rheumatologist, Dr. Bajaj." (doc. 13 at 14.) The ALJ's decision does show that the appropriate factors were considered when analyzing and discounting Dr. Bajaj's opinions on Plaintiff's functional limitations, however. Regardless, the ALJ was not required to perform a full factor-by-factor analysis when rejecting Dr. Bajaj's opinion because he relied on competing first-hand medical evidence, including Drs. Reed's and Blair's medical records and Dr. Bajaj's own treatment notes, and he found the opinions of the other examining physicians more well-founded. *See Newton*, 209 F.3d at 458 (explaining why a detailed analysis under § 404.1527 is unnecessary when "there is competing first-hand medical evidence" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion"). The ALJ's decision to reject Dr. Bajaj's treating source opinion on Plaintiff's functional limitations does not amount to reversible error. *See id.* To the extent that Plaintiff complains of the failure to include Dr. Bajaj's medical opinions about her physical limitations in determining her RFC, the ALJ did not err, and remand is not required on this issue

C.    **Subjective Complaints**

Plaintiff argues that the ALJ "failed to consider all of [Plaintiff's] vocationally significant

impairments" based upon her testimony from the hearings on her subjective complaints of pain. (doc. 13 at 15.)

When the ALJ issued his decision, Social Security Ruling: SSR 96–7p[5] required him to follow a two-step process for evaluating a claimant's subjective complaints.  SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).  First, the ALJ must consider whether the claimant had a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  *Id.*  Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities.  *Id.*  If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements.  *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record, including medical signs and laboratory findings, and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effect.  SSR 96–7p, 1996 WL 374186 at *2. The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements:

---

[5]  Effective March 16, 2016, the Social Security Administration eliminated "use of the term 'credibility' from [its] sub-regulatory policy," clarifying "that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL 1020935 at *1 (S.S.A. Mar. 16, 2016). When the ALJ issued his decision here, SSR 96-7p was the relevant social security ruling and specifically used the term "credibility." SSR 96-7P, 1996 WL 374186 at *7 (S.S.A. July 2, 1996).  His credibility finding is properly analyzed under SSR 96-7p.  *See Mayberry v. Colvin*, No. CV G-15-330, 2016 WL 7686850 at *5 (S.D. Tex. Nov. 28, 2016), *adopted by* 2017 WL 86880 (S.D. Tex. Jan. 10, 2017) (noting that "[b]ecause the text of SSR 16–3p does not indicate the SSA's intent to apply it retroactively, the Court would be disinclined to do so").  Even if SSR 16-3p applied retroactively, however, the recommendation concerning this issue would not differ.

1. the claimant's daily activities;

2. the location, duration, frequency, and intensity of pain or other symptoms;

3. factors that precipitate and aggravate symptoms;

4. the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms;

5. treatment, other than medication, for relief of pain or other symptoms;

6. measures other than treatment the claimant uses to relieve pain or other symptoms (*e.g.*, lying flat on his or her back);

7. and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  *Id.* at *3.

Although the ALJ must give specific reasons for his credibility determination, "neither the regulation nor interpretive case law requires that an ALJ name, enumerate, and discuss each factor in outline or other rigid, mechanical form. It suffices when the administrative decision is sufficiently specific to make clear that the regulatory factors were considered." *Prince v. Barnhart*, 418 F. Supp. 2d 863, 871 (E.D. Tex. 2005).  Moreover, the Fifth Circuit has explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints.  *Falco*, 27 F.3d at 164.  The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility, since he "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco*, 27 F.3d at 164 n.18.

Here, the ALJ noted the proper standard and two-step analysis for evaluating subjective complaints and symptoms based "on a consideration of the entire case record." (R. at 17.)  He then identified Plaintiff's testimony from both hearings, including her general complaints about

30

headaches and the pain in her ankles, knees, hips, hands, and wrists, as well as the specific testimony about how she could walk for only 10 to 15 minutes, stand for 20 to 30 minutes, sit for 15 to 20 minutes, and had to lie down for "a total of two hours throughout an average day." (R. at 18.) He next reviewed her medical records from Dr. Reed, Cleburne Orthopedics, Dr. Eitel, Ms. Bruce, Dr. Bajaj, the SAMCs' opinions, and her X-rays and MRI results. (R. at 20-29.) He found overall that her medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but her allegations concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible because the medical evidence did not support fully support her testimony. (R. at 20.)

Plaintiff argues that the ALJ incorrectly evaluated her subjective complaints because the RFC assessments from Dr. Bajaj and the medical opinions from Hoffman Family Practice Associates supported her testimony. (doc. 13 at 15-17.) As discussed, the ALJ fully analyzed Dr. Bajaj's treating source opinions and properly gave them "limited weight." (R. at 29.) The ALJ similarly found that "[a]lthough Dr. Bajaj's opinions supported [Plaintiff's] allegations [of subjective complaints,] Dr. Bajaj's own treatment notes did not support her opinions." (R. at 25.) He specifically noted that Dr. Bajaj's records showed swelling and tender points, but "the remaining portion of the physical examination was within normal limits," such as the consistent findings of "normal muscle strength and tone, a normal spine, a normal gait, no laxity of her joints, and normal range of motion." (R. at 25, 519, 521, 525, 527, 555, 562, 574-75, 581, 588, 602, 604.) The medical records from Hoffman Family Practice Associates similarly showed no cardiovascular or musculoskeletal abnormalities, and "5/5" muscle strength in both of her upper extremities, even when an X-ray showed "decreased joint space in upper glenohumeral joint."[6] (R. at 611, 615, 616-

---

[6] Plaintiff points out in this section that "the ALJ also completely ignored the records of Dr. J. Gregory Hoffman" from the Hoffman Family Practice Associates. (doc. 13 at 17.) Though the ALJ's decision did not explicitly weigh this

17, 619-20, 622, 625.) The ALJ ultimately "found nothing in the objective findings supporting the severity of the limitations alleged by [Plaintiff]." (R. at 26.) Although not in a formalistic fashion, the ALJ did properly assess Plaintiff's subjective complaints and severity of her limitations as required under the Social Security Regulations. *See Falco*, 27 F.3d at 164.

The ALJ must consider subjective evidence of pain, but it is within his discretion to determine the pain's disabling nature. *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003). Courts, moreover, have articulated that the lack of objective medical evidence or treatment may support an ALJ's adverse credibility ruling. *See Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988) (recognizing "that an absence of objective factors indicating the existence of severe pain–such as limitations in the range of motion, muscular atrophy, weight loss, or impairment of general nutrition–can itself justify the ALJ's conclusion"); *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (stating that the ALJ was not precluded from relying on the lack of prescribed treatment as an indication of nondisability). Additionally, the ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference. *See Carrier*, 944 F.2d at 247. Plaintiff has not shown that the ALJ erred in his analysis, particularly because his decision shows that he properly considered the record as a whole. *See Lopez v. Astrue*, 854 F. Supp. 2d 415, 424-25 (N.D. Tex. 2012) (finding that the ALJ properly evaluated the plaintiff's credibility by expressly acknowledging that he "experienced some level of pain and functional loss, but concluded that [the] plaintiff's subjective complaints of pain were out of proportion to the objective medical evidence"). To the

---

particular medical record, it does state that the ALJ "read and considered all of the medical evidence in the file, even if not specifically mentioned in the decision," and Plaintiff has failed to show how any error to weigh this medical record was harmful. *See Hammond*, 124 F. App'x at 851. To the extent that Plaintiff brings this as a separate issue, there is no harmful error and remand is not required.

extent that Plaintiff complains of the failure to include "work-related limitations" to her RFC based upon her testimony, the ALJ did not err, and remand is not required on this issue.

## IV. RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**

**SO RECOMMENDED** on this 26th day of February, 2018.

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE